IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 21, 2005

## STATE OF TENNESSEE v. CHRISTA G. PIKE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-D-2294    J. Randall Wyatt, Jr., Judge**

_____

**No. M2005-00738-CCA-R3-CD - Filed March 6, 2006**

_____

The defendant, Christa G. Pike, appeals her conviction for attempted first degree premeditated murder, a Class A felony. The defendant contends she was acting in defense of a third party, an inmate, and that the evidence is insufficient to support her conviction. Finding no error at trial, we affirm the conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

John C. Ford, Nashville, Tennessee, for the appellant, Christa G. Pike.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Michael D. Rohling and Kathy Morante, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

A Davidson County jury found the defendant guilty of her indicted charge, attempted first degree premeditated murder. The defendant was sentenced to twenty-five years as a multiple offender concurrent with a prior conviction of first degree premeditated murder with a sentence of death. The defendant presents five issues for our review:

1) The evidence was insufficient to support the conviction.
The trial court erred:
2) In failing to grant the defendant's motion for new trial due to the victim's reference to the defendant's death row status;
3) By disallowing testimony of details concerning the victim's prior first degree murder case;
4) By disallowing cross-examination of the victim regarding specific instances of her violent behavior; and

5) By allowing the prosecutor to refer to the defendant as a wolf during closing argument.

Upon careful review, we conclude that the evidence was sufficient to convict the defendant beyond a reasonable doubt. We further conclude that the reference to the defendant's death row status was not sufficiently prejudicial to require a new trial. The defendant, by failing to present the remaining issues to the trial court in the motion for new trial, has waived the issues on appeal. Accordingly, we affirm the conviction and judgment.

Factual Background

The origins of this case began during the early morning hours of August 24, 2001, at the maximum security unit of the Tennessee Prison for Women. Due to a fire, three inmates, Patricia Jones, Natasha Cornett, and the defendant, were evacuated from their cells to a recreation cell or cage. A dispute arose between Cornett and the victim, Jones. The defendant intervened by choking the victim into unconsciousness with a heavy shoe or boot lace. The State contended that the defendant made a premeditated attempt to murder the victim. The defendant argued that she was acting to protect a third party, Cornett, from the victim.

Patricia Jones, the victim, testified that due to a fire in her wing of Tennessee Prison for Women she was moved from her cell and placed in an exercise cage. Two other inmates, the defendant and Natasha Cornett, were placed in the same cage. The victim and Cornett began arguing, and Cornett swung at the victim but missed. The victim said she was about to fight Cornett when the defendant came behind her and choked her until she was unconscious.

On cross-examination, the victim stated that during that time she weighed 217 pounds. She estimated she was twice the size of the defendant and three times the size of Cornett. She admitted that she had pled guilty to first degree premeditated murder. The victim estimated that she and the defendant had been incarcerated in the Knox County Jail for one and a half to two years before both were transferred to Tennessee Prison for Women.

The victim related that in the summer of 2001, there had been three fires on the segregation unit that required evacuation of the inmates from their cells. The third fire was on August 24, 2001. The victim expressed her dislike for Cornett because "[s]he got in my face." The victim had on different occasions in the past thrown a bloody Kotex and a shoe in Cornett's face.

On the night of the first fire evacuation, the victim confronted Cornett, but another inmate intervened on Cornett's behalf. The victim said she whipped the unnamed inmate. The defendant was present and witnessed the events but was restrained by handcuffs.

The victim denied hating Cornett but did admit telling a physician that, "I just want to kill her, maybe, come up behind her and split her throat, or catch her when the police ain't around and

-2-

just beat her until I get tired." On redirect, the victim expressed her hate for Cornett but denied feeling hatred for the defendant.

Shaunna Fitzgerald, a correctional officer, was working at the Tennessee Prison for Women on the night of August 24, 2001. She testified that she assisted in releasing inmates from their cells due to the fire. Officer Fitzgerald witnessed an argument between Cornett and the victim in the recreational cage. She stated that Cornett swung at the victim and missed. The defendant then went behind the victim and began choking her. The victim fell to the ground on her stomach. Officer Fitzgerald attempted to pull the defendant off the victim, and the defendant stated, "The way you're pulling my hands, you're just helping me choke the bitch." Another guard, Officer Cheatham, responded and moved the defendant away from the victim. Officer Fitzgerald picked up the object used by the defendant to choke the victim. She described it as similar to a drawstring from sweat pants. The defendant had suffered what Officer Fitzgerald described as rope burns on the top of both hands. She stated that the victim was given aid by firemen and was not hospitalized.

Sergeant Dennis Henry, a correctional officer at Tennessee Prison for Women, spoke with the defendant on August 24, 2001, shortly after the incident. He described the defendant's attitude as proud and unremorseful. The defendant stated that if she had been given thirty more seconds "she would have killed the bitch." The defendant made no mention to Sergeant Henry of acting to defend Cornett.

Christie Donoho had served as an internal affairs investigator for the Department of Correction and was the lead investigator in this case. Ms. Donoho interviewed the defendant on October 15, 2001. The recorded interview was played for the jury at trial wherein the defendant described the events of August 24th. She stated that when the inmates were moved from their cells during the fire, the new admissions were placed in one cage, the punitive inmates in another, and the three maximum security inmates in the third cage. The defendant stated that she took a boot lace with her. She said the victim had started fights with other inmates during two prior evacuations. On August 24th, the victim antagonized Cornett, and Cornett swung at the victim and missed. The victim "rared back to hit [Cornett]," and the defendant placed the lace around the victim's neck. The defendant stated that the victim eventually fell to the ground. The defendant then flipped the victim onto her stomach, sat on her, and continued choking her. This continued until officers intervened. When asked her intention toward the victim, the defendant said, "I don't wanna say that I intended to kill her but I would say that I didn't care if she died. I wouldn't lose any sleep over it if she did."

Ms. Donoho explained that all inmate phone calls, with the exception of attorney calls, are monitored and recorded. A call from the defendant to her mother was played for the jury. In regard to these charges, the defendant's mother asked the defendant who started the fight. The defendant responded that "nobody really started it. Patricia was running her damn mouth to Natasha. And she is constantly doin it, you know I hate that bitch." The defendant related that when the victim started to hit Cornett, " . . . I said, 'Oh, hell no!' And I wrapped that shoe string around of her and tried to choke the damn life out of her. She was passed out on the ground, Mamma, twitching, foaming at the mouth, her eyeballs were bugged out so far, her eyelids were flipped up."

"I'll betcha if she gets near me, I'm gonna do it again! I'm gonna succeed this damn time! See, now I know the difference between premeditated murder and what happened with Colleen. Cause see, I premeditated the hell out of this. Sure did. If I'd of had thirty more seconds, I'd, we'd have a little chalk line out there in our rec pen, and that bitch would be gone somewhere."

In another recorded phone conversation with an individual named Lisa, the defendant gave a similar account of the choking incident:

Defendant:     I swear to God it was a set-up! And they said, "All max get in the same pen!" They should have known!

Lisa:          Yeah!

Defendant:     Dumb asses!

Lisa:          They are!

Defendant:     They know I hate her!

Lisa:          Yeah.

Defendant:     They know I . . . I . . . . I've gave them all fair warning that I would kill if I ever got near her.

Lisa:          Yeah.

Defendant:     So, it was a big choker, but I tried!

Lisa:          (laughs) Really?

Defendant:     I mean, seriously! And you know . . . I know the difference now between like, pre-meditated murder and what happened with Colleen.

Lisa:          Yeah.

Defendant:     Because I definitely pre-meditated this . . .

Lisa:          Huh-huh . . .

Defendant:      . . . and I never . . . my blood pressure never even went up . . .

Lisa:          Um . . .

Defendant:     . . . I stayed calm the whole damn time!  And I mean, it . . . and it was some tragic shit, too!

* * *

Defendant:     Yeah.  Actually, they don't want me nowhere near her . . . I don't blame 'em!

Lisa:          (laughs) I guess not.

Defendant:     Cause that's the way . . . I think that's the way I was . . . just as calming as I am right now.  And when . . . when the firemen came out there, and I don't know what they did CPR on her or what . . . cause I mean, she was like seriously unconscious.

Lisa:          Yeah.

Defendant:     If I'd of had 30 more seconds, there'd be like a little chalk line out in our rec pen.

Lisa:          Oh . . .

Defendant:     And I was just so calm.  And after they like brought her back, or whatever, and she was sittin' up there chokin' half to death on the bench . . . and, you know, trying to figure out where the hell she was . . . I . . . I asked her, you know, "Well, how does it feel to almost lose your worthless little life?"

On cross-examination, Ms. Donoho stated that the phone conversation with Lisa occurred on August 29th, and with the defendant's mother on August 30, 2001.  Ms. Donoho stated that the defendant told her that the victim had threatened her before the incident on August 24th.

The defendant testified that she was convicted for first degree murder.  She stated that she had known the victim since March 1995, having first met her at the Knox County Jail.  The defendant stated the victim had often attacked other people during her incarceration. She related an incident of the victim throwing another inmate into the bars, causing injury.  She stated that the victim had attacked two officers with a hard plastic tray in two separate incidents.  The defendant witnessed the victim attack two inmates who were on crutches.  The defendant said the victim had threatened her life on numerous occasions.  On yet another occasion, the victim attacked an inmate relations coordinator.  She said the victim habitually threatened Natasha Cornett's life.  The victim tried to attack both the defendant and Cornett during the first fire in the summer of 2001.

On the night of August 24th, the defendant stated that she took the lace when she was evacuated from her cell in anticipation of the victim causing problems.  She said she wanted to be

-5-

able to incapacitate the larger victim. The defendant stated she used the lace when the victim drew her fist to hit Cornett. Her stated intention was to protect Cornett.

By way of explaining her phone conversations, the defendant said she was trying to convince her mother that she could protect herself. The defendant explained her use of "premeditation" during the phone calls as her intent to protect Cornett and herself from the victim. She said that her only intention was to incapacitate the victim until others could intervene.

On cross-examination, the defendant admitted that she continued to choke the victim after the victim was unconscious and despite Officer Fitzgerald's efforts to stop her. The defendant said she feared Officer Fitzgerald could not restrain the victim and that she ceased choking the victim when Officer Cheatham entered the cage.

The defense called Natasha Cornett and two other inmates. Natasha Cornett stated that the victim had threatened her on several occasions. She described how the defendant stopped the victim from attacking her on August 24, 2001. She said the victim raised her hand to hit her, and the defendant choked the victim, pulling her back and down. On cross-examination, Cornett admitted that the defendant continued to choke the victim after the victim had become unconscious, her eyelids were "flipped up" and she was making gurgling noises. Joana Rosa, an inmate, testified that she had been attacked by the victim when she was unable to defend herself. Lethea Sweat, an inmate, stated that she intervened when the victim attempted to attack the defendant and Cornett during the first fire evacuation of August 2001.

Randy Mangrum was the defendant's final witness. He had been a corrections officer since 1982. Officer Mangrum knew both the victim and the defendant. He considered the victim dangerous and always handcuffed her when she was with other inmates.

Analysis

The defendant contends that the evidence was insufficient to support the conviction for attempted first degree premeditated murder. The standard for an appellate court reviewing a sufficiency challenge is "whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002); see also Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate references that may be drawn therefrom. State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000); see also Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599.

A verdict of guilt by the trier of fact resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." Evans, 108 S.W.3d at 236 (citing Bland, 958 S.W.2d at 659). Nor may this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37.

First degree murder is a premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1).

Criminal attempt is defined as follows:

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101.

The defendant argues that due to the victim's size and past history of violence that the defendant was justified in intervening to protect Natasha Cornett from the victim. A defendant is justified in threatening or using force to act in defense of a third person if, under the circumstances as the defendant reasonably believes them to be, the third person would be justified in acting in his or her own defense. T.C.A. § 39-11-612(1). Further, the defendant must reasonably believe the intervention is immediately necessary to protect the third person. T.C.A. § 39-11-612(2). A criminal defendant's conduct and mental state must meet an objective standard of reasonableness in order for the conduct to be justified under Tennessee Code Annotated sections 39-11-611 and 39-11-612. State v. Bult, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). In acting to protect the third person, the defendant "steps into the [third person's] shoes" and "may lawfully do [in the third person's] defense only what that person could have done, and no more." State v. Furlough, 797 S.W.2d 631, 652 (Tenn. Crim. App. 1990) (quoting State v. Barnes, 675 S.W.2d 195, 196 (Tenn. Crim. App. 1984)). The validity of a claim of defense of another is a matter for the jury's determination. Barnes, 675 S.W.2d at 196.

Although the defendant testified that she merely intended to incapacitate the victim, there was ample evidence by her actions and the defendant's own words that contradicted this position. According to eyewitness testimony from Officer Fitzgerald, the defendant had to be forcefully restrained from continuing to choke the unconscious victim. In her statement to Sergeant Henry and

in the two phone conversations, the defendant said that she would have killed the victim had she had thirty more seconds. The defendant's recorded phone conversations were especially candid in her professed intentions to kill the victim. Based on the evidence, the jury was eminently entitled to reject the defendant's claim of defense of a third person and to convict for attempted first degree premeditated murder.

## Death Row Reference

In her next issue, the defendant contends that the trial court erred in failing to grant a new trial due to a reference in testimony that the defendant was on death row. The defendant maintains that this was so prejudicial as to justify a new trial. The State responds that the issue was waived under Tennessee Rule of Appellate Procedure 36(a) by the defendant's failure to make a contemporaneous objection.

The defendant had, in a pre-trial motion in limine, successfully argued that the defendant's status as a death row inmate not be introduced. The trial judge had ruled that the prejudicial effect outweighed the probative value. During her testimony, the victim was asked about the individuals who were confined with her on the segregated unit on the night of this incident. The victim responded as follows: "Yes. Me and Natasha Cornett has [sic] been on A. Yeah. And of course Christa was back there locked down, being that she was on death row." No contemporaneous objection or motion for mistrial was made by the defendant. The issue was not raised until the filing of the motion for new trial.

We conclude that the defendant has waived this issue by her failure to object or request a curative instruction. Tenn. R. App. P. 36(a). Furthermore, we do not believe the trial judge's refusal to grant a new trial on this basis was an abuse of discretion. Although the unsolicited remark was prejudicial, it was mitigated by the setting in which these events took place. The inmates of the maximum security wing of the Tennessee Prison for Women are generally considered to have attained their status through other than innocent and meritorious means. During the course of the trial it was revealed that the defendant, the victim, Natasha Cornett, and Joana Rosa were all incarcerated for murder convictions. The unsolicited comment was not sufficiently prejudicial under this factual background to warrant a new trial.

The defendant has presented three remaining issues:
1) That the trial court improperly disallowed testimony of details concerning the victim's conviction for murder;
2) The trial court erred in disallowing cross-examination of the victim regarding her violent misconduct; and
3) Whether the prosecutor was guilty of misconduct in comparing the defendant to a wolf.

The defendant neglected to include these issues in either the original or amended motions for new trial and has accordingly waived the issues. Tenn. R. App. P. 3(e); see State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995).

-8-

Conclusion

After a careful review of the appellate record, we conclude that no reversible error is present. Accordingly, we affirm the defendant's conviction and judgment of attempted first degree premeditated murder.

_____
JOHN EVERETT WILLIAMS, JUDGE